J-S44039-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| CARLA V. RISOLDI | : | No. 2673 EDA 2016 |

Appeal from the Order August 1, 2016
in the Court of Common Pleas of Bucks County,
Criminal Division, No(s): CP-09-0002485-2015

| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| CARL ANTHONY RISOLDI | : | No. 2675 EDA 2016 |

Appeal from the Order August 1, 2016
in the Court of Common Pleas of Bucks County,
Criminal Division, No(s): CP-09-0002474-2015

| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| CLAIRE A. RISOLDI | : | No. 2677 EDA 2016 |

Appeal from the Order August 1, 2016
in the Court of Common Pleas of Bucks County,
Criminal Division, No(s): CP-09-0002487-2015

J-S44039-17

COMMONWEALTH OF PENNSYLVANIA, : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
v. :
:
SHEILA MARIE RISOLDI : No. 2679 EDA 2016

Appeal from the Order August 1, 2016
in the Court of Common Pleas of Bucks County,
Criminal Division, No(s): CP-09-0002475-2015

BEFORE: BENDER, P.J.E., SHOGAN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, JJ.: **FILED AUGUST 15, 2017**

In these consolidated appeals, the Commonwealth of Pennsylvania appeals from the Order denying its Motion seeking recusal of the trial judge in this case, the Honorable Thomas G. Gavin ("Judge Gavin"). We affirm.

By means of background, the Commonwealth alleges that Claire A. Risoldi ("Claire"), Sheila Marie Risoldi ("Sheila"), Carl Anthony Risoldi ("Carl"), Carla V. Risoldi ("Carla"), Mark Goldman ("Goldman"), Richard Holston ("Holston"), and Tom French (collectively, "Defendants"), engaged in a course of criminal conduct, over several years, to defraud various homeowner's insurance companies in a multi-million dollar insurance fraud scheme.[1] Some of the insurance claims involved three separate fires, in a span of less than five years, at a multi-million dollar home in Bucks County owned by some of the Defendants, known as "Clairemont." The third fire at Clairemont in

---

[1] The trial court provided a thorough factual background in its Opinion entered on September 15, 2015. *See* Trial Court Opinion, 9/15/15, at 2-9.

- 2 -

October 2013 resulted in the total loss of the residence. Following this fire, Defendants made a claim with their homeowners' insurer, American International Group, Inc. ("AIG"). Defendants also claimed that more than $10 million in jewelry was stolen during the firefighting efforts.

After a Grand Jury investigation, the Pennsylvania Attorney General's Office (the "AG")[2] filed Criminal Complaints against Defendants in January 2015, charging them with, *inter alia*, insurance fraud, intimidation of witnesses and corrupt organizations.[3] Due to the purported prominence of Claire and her family in the Bucks County political community, the entire Bucks County bench recused itself from the matter, and Judge Gavin, a Chester County judge, was specially appointed to preside over Defendants' cases.

In February 2015, the Commonwealth filed a Petition seeking to bypass the preliminary hearings for Defendants, pursuant to Pa.R.Crim.P. 565. The trial court denied this Petition following a hearing. At the preliminary

---

[2] The Bucks County District Attorney's Office requested that the AG handle these cases.

[3] During the Grand Jury investigation, Defendants instituted a civil suit against AIG in federal court for refusing to pay damages pursuant to the insurance policies in place at the time of the 2013 fire.

hearings held in March 2015, the Magisterial District Judge bound over for court the majority of the charges against Defendants.[4]

On June 15, 2015, Defendants respectively filed Petitions for *habeas corpus* relief (collectively, "the *Habeas* Petitions"), seeking dismissal of the charges.[5] The Commonwealth thereafter filed a Reply to the Petitions. At the close of a hearing on July 17, 2015, Judge Gavin (1) denied the Petitions filed by Carl, Carla and Sheila; (2) granted the Petition filed by Claire as to one count of corrupt organizations, but in all other regards denied Claire's Petition; and (3) granted the Petition filed by Goldman and dismissed all charges against him.[6]

In October 2015, the Commonwealth filed a Motion to revoke and/or raise Claire's bail, pointing out that it had filed new charges against her concerning witness intimidation. Judge Gavin denied this Motion.

In January 2016, Carla filed a Motion ("the Severance Motion"), which was joined by Carl and Sheila, seeking severance of their respective criminal

---

[4] In the interim, the Commonwealth filed a Motion seeking disqualification of Claire's counsel, Jack McMahon, Esquire ("Attorney McMahon"), which Judge Gavin denied.

[5] Holston filed his Petition for writ of *habeas corpus* later, on October 2, 2015. In December 2015, Judge Gavin granted Holston's Petition and dismissed all of the charges against him. The Commonwealth filed an appeal from the dismissal, docketed at 223 EDA 2016, which is pending before this Court.

[6] The Commonwealth thereafter refiled the charges against Goldman, along with some new charges. Following a preliminary hearing, Judge Gavin again dismissed all charges against Goldman in December 2015. The Commonwealth filed an appeal from the dismissal, docketed at 3822 EDA 2015, which is pending before this Court.

cases from that of Claire. The Commonwealth thereafter filed a Response opposing severance. After a hearing ("the severance hearing"), Judge Gavin granted the Severance Motion.

On April 18, 2016, the Commonwealth filed a Motion to recuse Judge Gavin. Three days later, it filed a Supplemental Motion to recuse. Carla thereafter filed an Answer to the Motion to recuse, which was joined by the remaining Defendants. Judge Gavin conducted a hearing on the Motion to recuse on April 29, 2016.[7]

On June 10, 2016, the Commonwealth filed a Motion seeking to hold Claire in contempt of a prior Order prohibiting her from contacting witnesses and to revoke her bail. Following a hearing on the same date, Judge Gavin found Claire in indirect criminal contempt and sentenced her to thirty days in jail.[8]

By an Order entered on August 1, 2016, Judge Gavin denied the Commonwealth's Motion to recuse, and filed therewith an Opinion setting forth his reasons for the denial ("Recusal Opinion"). In response, the

---

[7] On May 12, 2016, the Commonwealth filed a Post-Hearing Memorandum in support of the Motion to Recuse.

[8] This Court affirmed Claire's judgment of sentence on July 17, 2017. **See Commonwealth v. Risoldi**, 1864 EDA 2016 (Pa. Super. filed July 17, 2017) (unpublished memorandum).

Commonwealth timely filed a Notice of Appeal.[9]  Judge Gavin ordered the Commonwealth to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.  The Commonwealth timely filed a Concise Statement, which included numerous issues and spanned *sixteen pages*. Judge Gavin then issued a Pa.R.A.P. 1925(a) Opinion ("1925(a) Opinion").

The Commonwealth now presents the following issue for our review: "Whether the lower court abused its discretion by denying the Commonwealth's Motion to Recuse where objective scrutiny of the record casts doubt on the court's impartiality and/or where the court's behavior appears to be biased?"  Brief for the Commonwealth at 4 (capitalization omitted).[10]

Initially, we voice our disapproval of the Commonwealth's Concise Statement, which is anything but concise.[11]  Although Rule 1925(b) dictates

---

[9] In filing this interlocutory appeal, the Commonwealth complied with Pennsylvania Rule of Appellate Procedure 311(d), which provides that "[i]n a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution."  Pa.R.A.P. 311(d); **see also** Pa.R.A.P. 904(e).

[10] Though the Commonwealth purports to raise only one issue, it sets forth a multitude of discrete sub-issues in its eighty-four page Argument section, which largely mirror those presented in its voluminous Rule 1925(b) Concise Statement.

[11] Judge Gavin, in his 1925(a) Opinion, also chastised the Commonwealth's Concise Statement, which the court stated "is in large measure a generalized restatement of [the Commonwealth's] position[,] which [Judge Gavin's prior] Recusal Opinion addressed."  1925(a) Opinion, 10/17/16, at 1.

that, without more, the number of issues raised in a concise statement will not be grounds for finding waiver, this principle applies only "[w]here non-redundant, non-frivolous issues are set forth *in an appropriately concise manner*[.]" Pa.R.A.P. 1925(b)(4)(iv) (emphasis added); **see also Kanter v. Epstein**, 866 A.2d 394, 401 (Pa. Super. 2004) (holding that "[b]y raising an outrageous number of issues" in a Rule 1925(b) statement, an appellant impedes the trial court's ability to prepare an opinion addressing the issues on appeal, thereby effectively precluding appellate review). In the instant case, we, like the trial court, will address the merits of the sub-issues that the Commonwealth sets forth in its voluminous Argument section,[12] as its brief otherwise complies with our Appellate Rules. **See, e.g., Mahonski v. Engel**, 145 A.3d 175, 181 (Pa. Super. 2016) (stating that "the number of issues raised in a Rule 1925(b) statement does not, without more, provide a basis upon which to deny appellate review where an appeal otherwise complies with the mandates of appellate practice," and recognizing that the complexity of the matter under review is a consideration for courts to make prior to finding

---

[12] We note that although the Commonwealth's brief is ninety-nine pages long (and, according to the Commonwealth, is 23,255 words in length), it sought, and was granted, permission by this Court to exceed the brief's maximum word count, prescribed by Pa.R.A.P. 2135(a)(1) (providing that "the principal brief shall not exceed 14,000 words"). **See Commonwealth v. Roane**, 142 A.3d 79, 86 n.3 (Pa. Super. 2016) (where the appellant's principal brief was 122 pages in length, stating that the Court would consider the issues on their merits because counsel had filed a petition requesting permission to exceed the brief's maximum word count and page limit).

waiver based on the sheer volume of the concise statement) (quotation marks and citation omitted).

Our standard of review for a denial of recusal is well settled.

Our [Pennsylvania] Supreme Court presumes judges of this Commonwealth are honorable, fair and competent, and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice. The party who asserts a trial judge must be disqualified bears the burden of producing evidence establishing bias, prejudice, or unfairness necessitating recusal ….

As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion.

A trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially in a criminal case or whenever he believes his impartiality can be reasonably questioned. It is presumed that the judge has the ability to determine whether he will be able to rule impartially and without prejudice, and his assessment is personal, unreviewable, and final.

*Commonwealth v. Kearney*, 92 A.3d 51, 60-61 (Pa. Super. 2014) (citations, quotation marks, and brackets omitted); *see also* Pa. Code Jud. Conduct Canon 1.2 (providing that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance

of impropriety."). "Adverse rulings alone do not, however, establish the requisite bias warranting recusal, especially where the rulings are legally proper." *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 90 (Pa. 1998).

In its first sub-issue, the Commonwealth contends that Judge Gavin revealed his bias and an appearance of impropriety in his denial of the Commonwealth's Motion to disqualify Attorney McMahon as Claire's counsel. *See* Brief for the Commonwealth at 15-28. The Commonwealth asserts that Judge Gavin improperly overlooked the fact that Attorney McMahon had a conflict of interest in representing Claire, as the Commonwealth could call him as a necessary fact witness in this case, and had considered filing criminal charges against him. *See id.* at 18-23. The Commonwealth further claims that "shockingly, the [trial] court did not consider significant Attorney McMahon's statement to Commonwealth witness James O'Keefe[, an AIG insurance adjustor who performed an inspection of jewelry in 2014 concerning Defendants' jewelry loss insurance claim from the 2013 fire,] that 'snitches get stitches'" (hereinafter "the snitches comment"). *Id.* at 23; *see also id.* (explaining the context of the snitches comment). According to the Commonwealth, the snitches comment constituted intimidation of a witness "in a verbally threatening manner[.]" *Id.* at 24. Finally, the Commonwealth argues that several components of Judge Gavin's reasoning regarding this matter in the 1925(a) Opinion and Recusal Opinion exhibit an appearance of impropriety, including, *inter alia*, the court's (1) ignoring Attorney McMahon's

conflict of interest; (2) minimizing the significance of the snitches comment; and (3) failing to address several of the Commonwealth's arguments regarding this matter raised in the Motion to recuse. ***See id.*** at 26-28.

In his Recusal Opinion, Judge Gavin thoroughly addressed and expounded upon the Commonwealth's claims, and determined that he exhibited no bias or appearance of impropriety in denying the Commonwealth's Motion to disqualify Attorney McMahon. ***See*** Recusal Opinion, 8/1/16, at 22-29; ***see also*** 1925(a) Opinion, 10/17/16, at 5. As Judge Gavin's analysis is supported by the record, and we agree with his determination, we affirm on this basis as to the Commonwealth's first sub-issue. ***See id.***

In its second sub-issue, the Commonwealth urges that Judge Gavin abused his discretion by declining to recuse himself where he had engaged in improper *ex parte* communications with Claire. ***See*** Brief for the Commonwealth at 29-39; ***see also id.*** at 29-30 (explaining the context of the *ex parte* communication, wherein Claire directly contacted Judge Gavin via telephone and stated that she was without a lawyer and could not afford to retain one). According to the Commonwealth, this *ex parte* communication made Judge Gavin a potential fact witness. ***See id.*** at 32-33 (asserting that Claire's statement to Judge Gavin that she was destitute was relevant to the criminal charges against Claire, as she previously had made representations to AIG that she is a multi-millionaire and, thus, lacked a financial motive to

commit insurance fraud); *see also* Pa.R.E. 605 (providing that "[t]he presiding judge may not testify as a witness at the trial or other proceeding."). According to the Commonwealth,

> the *ex parte* communication between the court and Claire[,] including the court's failure to disclose the communication[,] coupled with the factual discrepancies and the court's reaction to the request to place the matter on the record[,] demonstrate clear bias and raise the appearance of impropriety. The court was required to disclose the communication pursuant to [Canon] 2.9 of the Code of Judicial Conduct[,[13]] as [Claire's] claims to the court directly contradicted statements to [AIG] and, therefore, constitute proof of the elements of the crimes which she is charged with.

Brief for the Commonwealth at 29 (footnote added). Finally, the Commonwealth asserts that Judge Gavin further exhibited his bias concerning the *ex parte* communications in addressing this matter in his Recusal Opinion and 1925(a) Opinion. *See id.* at 35-39.

Judge Gavin adeptly addressed and expounded upon the Commonwealth's above claims in his Recusal Opinion and 1925(a) Opinion, and determined that (1) no improper *ex parte* communication had occurred; and (2) there was no reason for Judge Gavin to recuse himself in this regard. *See* Recusal Opinion, 8/1/16, at 7-9, 29-32; *see also* 1925(a) Opinion,

---

[13] Canon 2.9 provides, in relevant part, that, generally, "[a] judge shall not initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter[.]" Pa. Code Jud. Conduct Canon 2.9(A); *see also id.* Canon 2.9(B) (stating that "[i]f a judge inadvertently receives an unauthorized *ex parte* communication bearing upon the substance of a matter, the judge shall promptly notify the parties of the substance of the communication and provide the parties with an opportunity to respond.").

10/17/16, at 1-3. We agree with Judge Gavin's sound rationale and determination, which, contrary to the Commonwealth's claim, does not exhibit bias or an appearance of impropriety. Accordingly, we affirm on this basis as to the Commonwealth's second sub-issue. ***See id.***

In its third sub-issue, the Commonwealth argues that "[t]he trial court abdicated its responsibility to protect witnesses from repeated efforts by Claire [] to intimidate and improperly influence [them,] which demonstrates clear bias and advances the appearance of impropriety." Brief for the Commonwealth at 39; ***see also id.*** at 39-52. The Commonwealth maintains that Claire engaged in multiple instances of intimidation of Commonwealth witnesses, all of which the trial court "made light of … and exhibited a clear misunderstanding of the charges." ***Id.*** at 41; ***see also id.*** at 39-43, 45-46 (detailing the alleged instances of witness intimidation). According to the Commonwealth,

> [t]he court failed to hold [Claire] accountable for [her] continued efforts to intimidate and influence witnesses[,] by giving her at least a fourth "bite" at intimidation[,] which clearly raised an appearance of impropriety. The court itself appeared to acknowledge that it had "bent over backwards" for Claire []. As such, a significant minority of the lay community could reasonably question the court's impartiality.

***Id.*** at 47 (citation omitted); ***see also id.*** at 42 (asserting that "[t]he trial court was [] aware that, despite being held for court on two charges of intimidation, Claire [] continued that conduct following her preliminary hearing and subsequent *habeas* proceedings.").

In his Recusal Opinion and 1925(a) Opinion, Judge Gavin exhaustively addressed the Commonwealth's claim, set forth the applicable law, explained the complained-of instances of Claire's purported intimidation of witnesses, and determined that the court did not exhibit any bias or appearance of impropriety in this regard to merit recusal. *See* Recusal Opinion, 8/1/16, at 9-22; *see also* 1925(a) Opinion, 10/17/16, at 4-5. We agree with Judge Gavin's sound rationale and determination, which, contrary to the Commonwealth's claim, does not exhibit bias or an appearance of impropriety. Accordingly, we affirm on this basis as to the Commonwealth's third sub-issue. *See id.*

In its fourth sub-issue, the Commonwealth argues that Judge Gavin's resolution of the *Habeas* Petitions demonstrated his bias against the Commonwealth and evidenced an appearance of impropriety. *See* Brief for the Commonwealth at 52-86. The Commonwealth complains that "[d]uring the oral argument on the [*H*]abeas [P]etitions, [] it appeared that the court had not reviewed either" "the 199 exhibits that were admitted during the preliminary hearing … [or] the transcript from the lengthy preliminary hearing …." *Id.* at 53. According to the Commonwealth,

> [d]espite not having read the transcript or reviewed the evidence, during the oral argument on the [*H*]abeas [P]etitions, the court repeatedly challenged the Commonwealth's version of facts and accepted the defense version[,] in contravention of the well-established standards for evaluating whether or not a *prima facie* case had been established. While under normal circumstances this would be troubling, in the present case it is even more alarming because the court did so without having read the

transcript. And, because the court had not read the transcript, it relied on averments in the defense filings which were not part of the record.

*Id.* at 53-54. The Commonwealth further avers that, "the court repeatedly refused to give effect to reasonable inferences drawn from the Commonwealth's evidence as required[,] as well as failed to view the evidence in the light most favorable to the Commonwealth." *Id.*; *see also id.* at 54-57 (detailing the alleged occurrences). The Commonwealth contends that Judge Gavin also "made improper credibility determinations, [] exhibited a misunderstanding of or refusal to acknowledge the elements of the offenses charged[,] as well as mischaracterized the Commonwealth's theory of the case." *Id.* at 52. Finally, the Commonwealth asserts that Judge Gavin's granting the *Habeas* Petitions filed by Goldman and Holston, and dismissing all charges against them, reveals the court's bias against the Commonwealth and "demonstrate glaring examples of the court's failure to view the evidence in the light most favorable to the Commonwealth[.]" *Id.* at 59.[14]

In his Recusal Opinion and 1925(a) Opinion, Judge Gavin thoroughly addressed and expounded upon the Commonwealth's claims, and determined that he did not abuse his discretion in declining to recuse in this regard. *See*

---

[14] In the interest of brevity, we will not set forth herein the Commonwealth's voluminous argument in support of the claim that Judge Gavin erred in granting the *Habeas* Petitions filed by Goldman and Holston, but instead refer to its brief. *See* Brief for the Commonwealth at 59-86. Further, as noted above, the Commonwealth's appeals from the Orders granting these Petitions are pending before this Court.

Recusal Opinion, 8/1/16, at 32-40; **see also** 1925(a) Opinion, 10/17/16, at 6-7. Judge Gavin's analysis is supported by the record, and we agree with his determination; accordingly, we affirm on this basis as to the Commonwealth's fourth sub-issue. **See id.**

In its fifth sub-issue, the Commonwealth contends that Judge Gavin's resolution of the Severance Motion demonstrates his bias against the Commonwealth and misunderstanding of the case. Brief for the Commonwealth at 86; **see also id.** at 87 (asserting that "[t]he court's resolution also demonstrated … an effort to prevent the Commonwealth from presenting relevant evidence."). According to the Commonwealth, "[t]he fact that the court *sua sponte* fashioned a severance that significantly damaged the prosecution as to all [D]efendants[,] and provided a potentially viable appellate issue for the lead defendant[, *i.e.*, Claire,] provides substantial evidence that the court has lost objectivity." **Id.** at 87.

In his Recusal Opinion and 1925(a) Opinion, Judge Gavin addressed the Commonwealth's claim and determined that recusal was not warranted in this regard. **See** Recusal Opinion, 8/1/16, at 40-42; **see also** 1925(a) Opinion, 10/17/16, at 7-8. Judge Gavin's cogent reasoning is supported by the record, and we discern no abuse of his discretion in declining to recuse. Accordingly, we affirm on this basis concerning the Commonwealth's fifth sub-issue. **See id.**

In its sixth sub-issue, the Commonwealth argues that "because []
[D]efendants have never claimed that they would be prejudiced from the
recusal, [Judge Gavin's] response to the recusal [M]otion added to the
appearance of impropriety."  Brief for the Commonwealth at 91; *see also id.*
at 88-91.

Judge Gavin concisely addressed and rejected this claim in his 1925(a)
Opinion.  *See* 1925(a) Opinion, 10/17/16, at 8.  We affirm on this basis as to
the Commonwealth's sixth sub-issue.  *See id.*

In its seventh sub-issue, which the Commonwealth titles
"Miscellaneous," it avers that Judge Gavin exhibited an appearance of
impropriety in his (1) mischaracterization of the testimony of Commonwealth
witness Ashley Rodrigues ("Rodrigues");[15] and (2) "continued unfamiliarity
with the record" as concerns Rodrigues's testimony.  Brief for the
Commonwealth at 91-93.  The Commonwealth asserts that "[t]he court's
characterization of Rodrigues as 'a cleaning lady' rather than an individual
specially trained to evaluate and painstakingly catalog the contents of
properties exhibits a continued unfamiliarity with the record[,] as well as an
ongoing effort to minimize evidence[,] to the detriment of the
Commonwealth[.]"  *Id.* at 92; *see also id.* at 92-93 (asserting that the

---

[15] The Commonwealth asserts that Rodrigues is an employee of a company
that "evaluates building contents alleged to be damaged or lost in connection
with an insurance claim[,]" who "led a team of individuals trained to evaluate
and catalog the contents of [Clairemont, after the 2013 fire,] including
window treatments."  Brief for the Commonwealth at 92.

court's Recusal Opinion is factually incorrect to the extent it states that Rodrigues was involved in the investigation of the 2010 fire at Clairemont, which exhibits the court's unfamiliarity with the record). Additionally, the Commonwealth argues that Judge Gavin improperly considered credibility issues in resolving the *Habeas* Petitions. **Id.** at 93 (citing Recusal Opinion, 8/1/16, at 44-45 (wherein Judge Gavin stated that his Opinions "are written to demonstrate [his] compliance with the controlling legal principles applied to the *credible facts*.")) (emphasis supplied by the Commonwealth).

In his 1925(a) Opinion, Judge Gavin addressed the above claims and opined that he did not abuse his discretion in refusing to recuse in this regard. **See** 1925(a) Opinion, 10/17/16, at 8-9; **see also** Recusal Opinion, 8/1/16, at 42-44 (addressing the court's remarks concerning Rodrigues). We affirm on this basis as to this sub-issue, **see id.**, with the following addendum. Contrary to the Commonwealth's claim, we discern no bias or appearance of impropriety as to either Judge Gavin's (1) remark in the 1925(a) Opinion concerning the alleged public perception (and media reporting) of the court's bias in favor of Defendants; or (2) purportedly disparate allocation of peremptory challenges to the parties. **See** Brief for the Commonwealth at 93-94.

In its final sub-issue, the Commonwealth contends that the cumulative effect of Judge Gavin's above-mentioned actions "demands" recusal. **See** Brief for the Commonwealth at 95-97 (citing **Commonwealth v. Johnson**,

966 A.2d 523, 532 (Pa. 2009) (stating "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation"), and ***Commonwealth v. Rhodes***, 990 A.2d 732, 748-49 (Pa. Super. 2009) (stating that "a party's call for recusal need not be based only upon discreet incidents, but may also assert the cumulative effect of a judge's remarks and conduct even though no single act creates an appearance of bias or impropriety.")).  According to the Commonwealth, "[w]hen considered as a whole, the totality of [Judge Gavin's] errors, misstatements of facts, failure to adhere to well-established legal principles, *ex parte* communications, exhibition of hostility towards the Commonwealth's attorneys, deference to [] [D]efendants, and abdication of judicial responsibilities, the appearance of bias and impropriety is unmistakable" and "painfully evident").  Brief for the Commonwealth at 95, 97.  We disagree.

Judge Gavin addressed and rejected this claim in his 1925(a) Opinion and Recusal Opinion.  ***See*** 1925(a) Opinion, 10/17/16, at 9-10 (distinguishing ***Rhodes***, ***supra*** and ***Johnson***, ***supra***); ***see also*** Recusal Opinion, 8/1/16, at 57-58 (citing ***Commonwealth v. Williams***, 615 A.2d 716, 722 (Pa. 1992) (stating that no number of failed claims may collectively attain merit if they could not do so individually)).  We agree with Judge Gavin's analysis and determination, which is supported by the record and the law.  Accordingly, we affirm on this basis with regard to the Commonwealth's final sub-issue.  ***See***

1925(a) Opinion, 10/17/16, at 9-10; ***see also*** Recusal Opinion, 8/1/16, at 57-58.

In closing, we discern no bias or appearance of impropriety in Judge Gavin's evenhanded handling of these contentious cases. Judge Gavin articulated sound, thorough reasoning supporting his determination that he could preside over these cases impartially, which is supported by the record. In this regard, we incorporate herein Judge Gavin's summarization of his position, as set forth in the Recusal Opinion. ***See*** Recusal Opinion, 8/1/16, at 2-3, 4 (wherein Judge Gavin stated, *inter alia*, as follows: "The main thrust of the [] [M]otion[] to recuse is that I am favoring the defense at the expense of the prosecution. I flatly reject this suggestion. The only party favored is the one with the facts and law on its side, something I have adhered to in my rulings in this case. … I have no bias for or against any party. I believe that an objective review of my handling of this case will show an evenhanded approach[,] guided by the applicable legal principles and the credible objective evidence pertinent to the decision then being made.").

Accordingly, we affirm the Order denying the Commonwealth's Motion to recuse.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/15/2017

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA

Commonwealth v. Sheila Marie Risoldi : CP-09-CR-0002475-2015

Commonwealth v. Carla V. Risoldi : CP-09-CR-0002485-2015

Commonwealth v. Carl Anthony Risoldi : CP-09-CR-0002474-2015

Commonwealth v. Claire A. Risoldi : CP-09-CR-0002487-2015

Kelly M. Sekula, Esquire, Senior Deputy Attorney General
Emily Cherniack, Esquire and Jack McMahon, Esquire, for Defendant Claire A. Risoldi
Michael J. Engle, Esquire, for Defendant Carl A. Risoldi
Mary Therese Maran, Esquire, for Defendant Sheila M. Risoldi
Brian McMonagle, Esquire, for Defendant Carla V. Risoldi

## OPINION

### ISSUE

Does the Attorney General's, hereinafter AG, assertion that it intends to call me as a fact witness in its case against Defendant Claire Risoldi require my recusal?[1] Does the record support the AG's claim of bias in favor of all defendants such that I should recuse myself?[2] Did the court's handling of the Attorney McMahon disqualification matter; its failure to review the preliminary hearing transcript before oral argument on the defendants' Writs of Habeas Corpus and the court's inquiry into the status of Defendant Mark Goldman's private detective license evidence bias against the AG or

create an appearance of impropriety?[3]

## BACKGROUND

I address each motion in the order filed.

RECEIVED
CLERK OF COURTS
CRIMINAL DIVISION
HICKS COUNTY PA
2016 AUG -1 PM 3:17

## LEGAL PRINCIPLES

Because the AG's motions go to the heart of our legal system, the impartiality of

the judiciary, a matter I take most seriously, I will address their allegations in light of the

caselaw and the Code of Judicial Conduct.

The nature of litigation is that one side or the other prevails both during

preliminary proceedings and ultimately. A judge is at a disadvantage when he is

dealing with attorneys who are unknown to him and he/she to them as there is no

history of interaction between them. In such situations, a "thinking out loud" comment

can be construed as an expression of opinion when it is not intended as such. The

main thrust of the AG's motions to recuse is that I am favoring the defense at the

---

[1] See Recusal Motion #1 filed April 18, 2016 and docketed April 19, 2016.
[2] See Recusal Motion #2 filed and docketed on April 21, 2016.
[3] See Recusal Motion #3 filed and docketed on May 12, 2016. These issues were previously raised in Recusal Motion #2.

2

expense of the prosecution. I flatly reject this suggestion. The only party favored is the one with the facts and law on its side, something I have adhered to in my rulings in this case. Today, a non-prevailing party often resorts to a claim that the tribunal was biased and that was why they did not prevail. Here, the AG regards adverse rulings and/or my failure to act as it wishes as evidence of bias in favor of defendants and against the AG.

As I sat down to address these motions, I did so with the knowledge that I should judge my stewardship of this case by the following standards:

## THE CASELAW

It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

3

Commonwealth v. Abu-Jamal, 553 Pa. 485, 720 A.2d 79, 89 (1998) (citations omitted).

I have no interest in the outcome of this case other than to ensure that both parties have the opportunity to present relevant and admissible evidence to the fact finder, be it me initially, or the jury ultimately. I accepted this case knowing that it would be a high profile one and that my every act would be subject to scrutiny and criticism. My sole goal is to ensure that those who scrutinize my rulings will agree that they are based on credible facts and the controlling legal principles. As to criticism, it is an accepted part of judicial life and is to be expected from one unhappy with the court's ruling(s).

I have no bias for or against any party. I believe that an objective review of my handling of this case will show an evenhanded approach guided by the applicable legal principles and the credible objective evidence pertinent to the decision then being made. I believe such an approach instills public confidence in the judiciary.

4

# CODE OF JUDICIAL CONDUCT

The Code of Judicial Conduct, Rule 1.2. Promoting Confidence in the Judiciary, requires that, "[a] judge shall act all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

Comment 5 to Rule 1.2 reads,

> [5] "Impropriety" is a defined term in the Terminology Section of the Code. Actual improprieties include violations of law, court rules or provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge. This test differs from the formerly applied common law test of whether a "significant minority of the lay community could reasonably question the court's impartiality.

Canon 1 of the Code of Judicial Conduct, Rule 1.2.

The issue of supposed communications between Defendant Claire Risoldi and me and/or my supposed intervention into Defendant Goldman's private detective license renewal and/or my conferring separately with counsel regarding the disqualification of Attorney McMahon call into play Rule 2.9 of the Code:

> (A) A judge shall not initiate, permit, or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter, except as follows:
>
> ...
>
> > (4) A judge may, with the consent of the parties, confer separately with the parties and

5

their lawyers in an effort to settle matters pending before the judge.

...

(B) If a judge inadvertently receives an unauthorized *ex parte* communication **bearing upon the substance** of a matter, the judge shall promptly notify the parties of the substance of the communication and provide the parties with an opportunity to respond.

(emphasis added).

Unfortunately, the Code does not define "**ex parte** communication" ostensibly in the belief that, like obscenity, one will know it when it is spoken. The essence of an "**ex parte** communication" is that it is taken by and for the benefit of one party only, and without notice to or the opportunity to be heard by any person adversely involved.

Rule 2.11 of the Code was also considered, as was the comment to the rule:

(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:

(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.

...

**Comment:**

[1] Under this Rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply.

Canon 2 of the Code of Judicial Conduct, Rule 2.11.

## DISCUSSION

6

## FIRST RECUSAL MOTION – Judge as Witness[4]

## BACKGROUND

Shortly after I filed my Habeas Corpus Opinion of September 15, 2015 (see Exhibit "A"), I received a call in my Chester County chambers from Defendant Claire Risoldi. The averments of paragraph 4. of the AG's Motion accurately reflect what occurred:

> As I am my own secretary, I answered my phone to a distraught Claire Risoldi who told me she was without an attorney and had no money to hire one. I believe we are all familiar with the speed at which she can speak and it took me a second to digest what she was saying. When I did, I immediately told her to stop speaking, to never call me again for any reason and that if she could not afford counsel to contact the Public Defender's office. She hung up and I contacted Mr. McMahon who indicated that he did represent her and would speak to her.

Motion for Recusal #1,pg. 2.

Based on this contact, the AG averred in paragraph 5 of the Motion that:

> 5. The substance of the conversation has made the Court a potential fact witness. **Claire Risoldi has made repeated material representations to AIG that she is a multi-millionaire with wealth valued between $75 and $80 million.** Risoldi's claims counter suggestions that the Risoldi family had a financial motive to commit fraud. The fact that the Commonwealth has confiscated or frozen approximately five million in assets is insufficient to explain Claire Risoldi's claim to this Court that she is destitute. Accordingly, the substance of the conversation is relevant to the criminal charges.

Motion for Recusal #1, pg. 2 (emphasis added).

---

[4] Motion of April 18, 2016.

7

The earliest appellate case I have found addressing a judge as a potential witness is Brown v. Bahl, 111 Pa.Super. 598, 170 A. 346 (1934). In Brown, an automobile accident case, the trial judge had driven past the accident scene shortly after it had happened. Defense counsel requested recusal as, "the trial judge would have been a competent witness for either party," Brown at 602, 348. The court stated,

> Undoubtedly a trial judge should not preside where he is a material witness but, in the instant case, **where other witnesses were available as to the facts** that he observed, there is no ethical or legal reason to disqualify him simply because of his knowledge, particularly where counsel have proceeded without formal objection until the case is practically concluded.

Brown at 602, 348. (emphasis added).

Commonwealth v. Musto, 348 Pa. 300, 35 A.2d 307 (1944), was a homicide case where defendant shot and killed his ex-wife on the courthouse steps following a support hearing. On appeal, defendant claimed that the trial judge was disqualified as he was a potential witness having presided over the support matter that preceded the shooting. Justice Stern stated:

> [T]he judge was not disqualified merely because he might have been a witness in the case. There were available so many other witnesses as to what took place in the courtroom preceding the commission of the crime that there was no need for him to testify in regard thereto, and, under such circumstances, there was neither ethical nor legal reason why he should not have presided at the trial.

Musto at 304, 310. (citations omitted).

8

The AG acknowledges that representatives of the alleged victim, AIG, are available to testify as to Defendant's representations. The defense indicated it would stipulate to the contents of my e-mail. As I am also overseeing the forfeiture matters against the defendants, I am aware of the significant efforts made by Senior Deputy AG Shchuka to ascertain and verify the defendant's assets. I imagine he can identify and provide witnesses who will be able to testify as to the likelihood or not that Defendant Claire Risoldi has a multi-million dollar trust fund.

Given the myriad options the AG has to establish this point, there is no need for me to testify and thus no need for me to recuse myself.

I need not do a bias or appearance of impropriety analysis as those issues were not raised in this motion.

## SECOND RECUSAL MOTION[5]

**A. Court's abdication of responsibility to protect witnesses from repeated**

---

[5] This Motion was filed on April 21, 2016.

9

**efforts by Claire Risoldi at intimidation and improper influence**

As I understand the AG's position, it is that I did not act as they wished with regard to instances of what they regard as witness intimidation, i.e., I did not increase or revoke Claire Risoldi's bail.

## FACTUAL BASIS OF MY RULINGS

Subsequent to the fire that for all intents and purposes destroyed "Clairemont", the insurer, AIG, contested defendant's fire related claims. While **civil case discovery** was on-going, a representative of AIG, Mr. O'Keefe, met with Defendants Claire and Carl Risoldi, Attorney McMahon and a jewelry appraiser at Fox Chase Bank to look at jewelry that was kept there by Defendant Claire Risoldi. The date was August 14, 2014[6]. Defendant Claire Risoldi's calling Mr. O'Keefe "rat bastard", etc., was ill advised. The AG viewed it as witness intimidation when read together with Attorney McMahon's statement of "snitches get stitches" and ultimately charged her with witness intimidation. Defendant Claire Risoldi was held for court on this charge by Magisterial District Justice

---

[6] The AG was presenting its case against the defendants to the 35th Statewide Investigating Grand Jury during this same time period.

10

Roth. At oral argument on her Writ of Habeas Corpus, I questioned the correctness of the magisterial district justice's ruling. The AG asserts that my skepticism as to the O'Keefe intimidation based on his employment constitutes an abdication of my responsibility to protect witnesses because of their occupation. I think it fair to say that many insureds are unhappy with how their claims are handled. In fact, there are TV ads currently running where insurers are taken to task for being unresponsive to their insureds when they present a claim. Verbal expressions of unhappiness are a fact of life in litigation which my comment was intended to reflect **based on what I knew of the facts at that time**. Preliminary comments or rulings are not necessarily indicative of the final decision which is based on a review of all the evidence, not just parts of the evidence, something the AG should have been aware of based on my comments when I ruled on the preliminary hearing bypass issue:

> **THE COURT:** And given the obvious interest in fleshing out the Presentment, we're going to need a district judge who is experienced with recognizing the difference between someone fishing and someone actually going after something that is appropriate. Because, with all due respect to everyone involved, **I think there are parts of that Presentment, without any ruling one way or the other on my part,** that make out certain offenses rather clearly, and then there are other parts that are somewhat nebulous. And in my mind that would be the corrupt

11

organization as to when, etcetera, that is involved.

It also seems to me that much that is contained in the Presentment makes great 404(B) evidence, but I'm not necessarily certain it makes discoverable evidence for purposes of a preliminary hearing.

(N.T. 3/2/15, pg. 55, ll. 3-21)(emphasis added).

Further, it should have been clear to the AG that my comments were not a statement of my final position:

Again, **speaking off the top of my head**, the witness intimidation I don't see any intimidation of Mr. O'Keefe. Mr. O'Keefe is in the business. He's had angry policy holders get in his face. I don't see that.

(N.T. 7/7/15, pg. 195, ll. 13-17)(emphasis added.)

After reading the preliminary hearing transcript, I agreed her comments were more than a "verbal expression of unhappiness," they were intimidating within the evidentiary standard applicable at the preliminary hearing stage. I find it curious that the AG faults a ruling favorable to it as evidence of bias against it.

I also agreed that Defendant Claire Risoldi was properly held for witness intimidation of Tina Mazaheri. Again, the AG asserts that my comments regarding Attorney Mazaheri evidence a disregard of my duty to protect her from intimidation. Experienced trial judges try not to lose sight of the big picture. Ms. Mazaheri's

12

involvement in this case is proof positive of the old adage that "no good deed goes unpunished"[7]. An objective read of her preliminary hearing testimony evidences a person conflicted by her situation, not one intimidated by Defendant Claire Risoldi. In my view, she needed no protection from Defendant Claire Risoldi.

On October 9, 2015, the AG filed new charges against Defendant Claire Risoldi for contacting a prospective witness, Edward Foris. The preliminary hearing transcript of that proceeding (November 20, 2015) reveals that Mr. Foris related to the AG's investigator, Agent Gomez, that earlier in the year both Defendant Goldman and Defendant Claire Risoldi contacted him regarding jewelry appraisals that were at issue in the case. **He was not sufficiently concerned by the contact to report it to any police agency.** However, the AG saw it as witness intimidation, and I ultimately held Defendant Claire Risoldi for court on the charge.

On January 29, 2016, the AG alleged another attempted witness intimidation of Sharon Greenberg, who, unlike Mr. Foris, did contact the AG's office. As a result, the

---

[7] She agreed to rent her house to Defendant Claire Risoldi, who was then without housing, never believing that her doing so would enmesh her in

13

AG filed another motion to revoke/increase Defendant Claire Risoldi's bail.

The AG views my questioning it as to where to draw the line as to a defendant's right to contact a witness versus intimidation of the witness as evidence of hostility and bias toward it. Judges are not potted plants; we ask questions when we are attempting to understand counsel's position on an issue. At the hearing on April 29, 2016, I asked Attorney Augenbraun:

> THE COURT: Okay. With regard to the bail issues, what is the Attorney General's view of the right of a party defendant, either directly or through a third person, to contact a witness?
>
> THE WITNESS: I think my view is that when a defendant – well, I don't think defendants can directly contact witnesses. I think it's very problematic.
>
> THE COURT: What's your authority for that position?
>
> THE WITNESS: What's my authority? Well, the fact that that's an ongoing problem. Can I cite to a statute right now? No, I can cite to that.

(N.T. 4/29/16, pg.120, ll. 9-23)(emphasis added).

I was, and am, surprised by this answer which appears to contravene the Rules of Professional Conduct, Rule 3.4 which reads in pertinent part:

> Rule 3.4. Fairness to Opposing Party and Counsel

defendant's legal issues.

A lawyer shall not:

(a) unlawfully obstruct another party's access to evidence or....;

...

(d) request a person other than a client to refrain from voluntarily giving relevant information to another party unless:

> (1) the person is a relative or an employee or other agent of a client; and

> (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information and such conduct is not prohibited by Rule 4.2.

Pa.R.P.C. 3.4.

See also the comment to the rule,

**EXPLANATORY COMMENT**

**[1] The procedure of the adversary system contemplates that the evidence in a case is to be marshalled competitively by the contending parties. Fair competition** in the adversary system **is secured by prohibitions against** destruction or concealment of evidence, improperly **influencing witnesses**, obstructive tactics in discovery procedure, and the like.

Pa.R.P.C 3.4, cmt. [1](emphasis added)

Given Attorney Augenbraun's viewpoint, it is not surprising that he views every contact

of a witness by Defendant Claire Risoldi as tantamount to an attempt to intimidate the

witness. Given the rule, it was appropriate to discuss the AG's reasoning as it and the

15

rule were factors to consider in making my bail decision.

The contact with Ms. Greenberg was addressed on February 8, 2016. See N.T., February 8, 2016, beginning at page 41 wherein Deputy AG Connolly makes his case for witness intimidation of Ms. Greenberg. The defense challenged whether Defendant Claire Risoldi even knew that Ms. Greenberg was a (potential) witness at the time of the contact. When I inquired as to that, Attorney Connolly responded:

> THE COURT: One of the problems I have right out of the gate is the woman who was called, other than being the sister of the deceased, what role, if any, can she possibly have in the case? How does she come in as a witness in the case other than to say my brother is dead?
>
> MR. CONNOLLY: Your Honor, that's not really the analysis here. The fact is she could be called as witnesses, possibly. Claire Risoldi believes she could be a witness and then calls her to try to get her to refrain from talking to the Attorney General's Office, so whether or not she is a star witness or a very small witness, that's not the analysis, your Honor.
>
> THE COURT: Okay, so I'll accept your analysis for the moment –
>
> MR. CONNELLY: Your Honor –
>
> THE COURT: I'll accept it. So what does she say to her other than the same refrain we are hearing, they are out to get me, it's politics, I'm sorry I got you involved?

(N.T. 2/8/16, pg. 45, l. 22, pg. 46, l. 21)

As I was not persuaded that Defendant Claire Risoldi's conduct fit even the most liberal

16

definition of intimidation, there was no factual or legal basis to increase her bail as a result of her interaction with Ms. Greenberg. Indeed, the AG must have agreed as they did not charge Defendant Claire Risoldi with witness intimidation of Ms. Greenberg. Yet, they cite the matter as evidence of my supposed bias.

Witness intimidation involves someone (defendant or their representative) approaching the witness and suggesting that they act in a manner favorable to defendant. At one extreme, the suggestion is verbally or physically threat-based; at the other, there is the subtle suggestion of some favor being done for the witness. The O'Keefe parking lot incident could be considered in the extreme camp, and the Mazaheri incident in the subtle as she was promised "jewelry".

18 Pa.C.S.A. § 4552, is a *mens rea* crime requiring that the person act with the intent to intimidate the witness. Threats or actual intimidation are not required. Where the inducement to testify in the manner defendant wants is pecuniary or some other promised benefit, a totality of circumstances test is used to determine if intimidation occurred. The recent case of Commonwealth. v. Doughty, 126 A.3d 951 (Pa. 2015),

17

disapproved Commonwealth v. Brachbill, 555 A.2d 82 (Pa. 1989), which the AG had cited as authority for its position. This case was considered in making my bail decision.

My analysis as to whether and when to increase bail begins with the premise that pretrial detention is disfavored. See Pa.R.Crim.P., Rule 520(A). Further, the comment to the rule is clear as to the considerations weighing on the decision to deny bail,

> *Comment.* Article I, § 14 of the Pennsylvania Constitution was amended in 1998 to read: "All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or **unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great; ...**"

Pa.R.Crim.P. 520, cmt. (emphasis added).

At the time of these bail requests, I did not believe for **bail purposes** that Defendant Claire Risoldi's statements to Mr. Foris were anything more than a precatory plea which he certainly did not view as intimidating.

The AG asserts that my questioning whether Ms. Greenberg was to be a witness is an irrelevant factor in addressing intimidation. I disagree. I asked the question, as I did not see how she could be a witness for the AG given that she had no direct contact

18

at any relevant time on any relevant issue with Defendant Claire Risoldi. However, when the AG, disagreed I accepted its position. (N.T. 2/8/16, pg. 46).

Finally, the AG asserts that my decisions not to increase/revoke Defendant Claire Risoldi's bail will have a "chilling effect" on potential witnesses coming forward or being willing to testify. I disagreed as the objective evidence was that Ms. Greenberg came forward and reported the contact. The fire and police personnel will most certainly continue to be willing to testify as they have been accused of theft, as will the insurance company and their agents/experts as they have an interest in the case beyond simply enforcing the criminal laws. I found the suggestion that "other potential witnesses" might not come forward not credible as the AG clearly has been very thorough in searching out potential witnesses.

The AG also cites my numerous warnings to Defendant Claire Risoldi and my subsequent failure to hold her accountable as evidence of an "inexplicable bias" in her favor. In support of this argument they cite my comment during the hearing of February 8, 2016:

19

Actually, Mr. Connolly, I don't know why you fight so hard to prevent her from sticking her foot in her mouth because it seems to me that you are going to be arguing this is consciousness of guilt evidence at some point in time. The more she runs around and talks to people and gets them to change their testimony, I would imagine with a little bit of research by your right-hand colleague there you are going to be arguing consciousness of guilt, so I would think you'd want her out there running around, doing everything and anything, since you seem to be right on top of it.

(N.T. 2/8/16, pg. 57, ll. 14-25, pg. 58, ll. 1-4).

The AG reads this comment as green-lighting defendant to run amok intimidating

witnesses for evidentiary gain. That comment has to be read in conjunction with what I

next said:

THE COURT: But what about the contempt? Mr. McMahon, I, to some extent, feel sorry for you, trying to control someone who apparently is uncontrollable. What's your answer? The clear intent of the Court was no contact.

(N.T. 2/8/16, pg. 58, ll. 5-10).

and

THE COURT: So that going forward, any contact by any means known or that might become known to Mrs. Risoldi's fertile mind will result in a contempt proceeding and, of course, you will remind her that contempt is punishable by jail and that she just might find herself awaiting trial sitting the Bucks County Prison.

(N.T. 2/8/16, pg. 59, l.18 – pg. 60 l. 1).

In fact, the AG subsequently brought a contempt action and I ordered Defendant

20

Claire Risoldi jailed. The reason I did so is because the AG had the facts and the law on its side in the contempt hearing, whereas it did not in the bail hearings.

A knee jerk reaction on my part to the many bail requests would have been to throw up my hands in exasperation over Defendant Claire Risoldi's conduct and do as the AG asked. However, exasperation is a poor basis upon which to base a decision. Having all the above information in mind, I determined that the conditions warranting an increase in, and/or revocation of bail referenced in Rule 520(A) had not been met and denied the requests. My decision did not reflect bias for or against anyone, rather, it was based on the objective evidence and controlling legal principles.

The AG cites as further evidence of my bias my comment at the conclusion of the preliminary hearing in the "Foris matter":[8]

> **THE COURT**: The juror commissioners – a completely different matter - are concerned with the number of jurors that ought to be called for a trial. I was doing some math in my head. I think we have a potential of six defendants. It's all felonies. So we have 42 peremptories among the defendants. Maybe we give the Commonwealth a couple extra, so we give you 10 and that gives us 52 peremptories out of the gate.

(N.T. 11/20/15, 148, II. 12-21).

---

[8] Motion to Recuse #2, pg.10.

21

My comment prompted Attorney McMahon to state:

> **MR. McMAHON:** You said, there's six defendants?
> I'm working on the presumption there's five defendants, certainly 35.
>
> **THE COURT:** All right. So with 35, we give them 10. That's 45, so I'm off by seven.

(N.T. 11/20/15, pg. 149, ll. 20-24).

Mr. McMahon saw fit to correct my error from the defense perspective. As the AG had not previously hesitated to correct me when he thought I was wrong, I wonder why he did not point out this error[9] then. I think it was obvious that in the process of shifting from one subject matter to another, I misspoke, most likely not for the last time in my judicial career. I doubt that any objective person would view my error as "indicative of (bias, let alone) ongoing bias".

## B.   Disqualification of Attorney McMahon

While the "presumption of innocence" is the foundation of our criminal justice system, the first building block on that foundation is representation by counsel of one's

choice. The second block is the ability to test the government's case at a preliminary hearing. The AG vigorously contested the defendant's request for a preliminary hearing which I granted over its objection on March 2, 1015. I did so pursuant to the controlling statute, 42 Pa.C.S.A. §4551(e). **Fifteen days later**, the AG filed its Motion to Disqualify Attorney McMahon which would have denied Claire Risoldi's right to counsel of her choice. The AG's reasons were:

> [A]n unwaivable conflict of interest, counsel's status as a witness in the case, counsel's participation in the incident involving James O'Keefe ("snitches get stitches"), counsel's potential violation of the Rules of Professional Conduct, and counsel's potential to be charged as a co-defendant in this case.

(Motion to Recuse #2, pg.14).

I was assigned to this case on February 12, 2015. During the argument on the preliminary hearing bypass Motion on March 2, 2015, Deputy AG Connolly described this case as, an "incredibly complex investigation by an Investigating Grand Jury that met for months. There's over 40,000 pages of documents, 93 witness transcripts, over a hundred exhibits that went before the Grand Jury." (N.T. 3/2/15, pg.13, ll. 3-8). In fact,

---

[9] Pa. Rule of Criminal Procedure, Rule 634(B)(3) mandates that the AG get the same number of challenges awarded to the defendants.

it was the AG's position at the bypass hearing that the transcripts and exhibits were not available to the defendants pursuant to Pa.R.Crim.P. Rule 556.10, but that the AG would agree to make them available sooner than permitted by Rule 556.10(B)(3)(b) if the defendants agreed to the bypass. These documents were likewise unavailable to me prior to the hearing of May 18 to disqualify Attorney McMahon and yet the inference of the AG in its recusal motion is that I should have been as familiar with the case as were attorneys Connolly and Augenbraun who were involved in it from the very beginning.[10] This, I submit, was an unrealistic expectation. Further, it left the court with no objective criteria against which to balance the self-serving subjective arguments of counsel. Simply stated, this initial hearing gave me nothing that I was comfortable with basing a decision on. Rather, it raised more questions than it answered requiring further consideration and review on my part.

I came away from the hearing with this evidentiary frame work in mind:

---

[10] They began their presentation to the Investigating Grand Jury in April of 2014. I assume they had been working on it well before that date.

24

### 1 – McMahon as a Witness

The AG asserted it needed Attorney McMahon to testify as to who gave him the information he passed on to the insurer, AIG, etc.

Attorney Donato, on behalf of Attorney McMahon, stated the defense would stipulate that one or more of the defendants were the source and, therefore, Attorney McMahon was not a necessary witness.

### 2 – Unwaivable Conflict

The AG asserted that Attorney McMahon's verification of the civil complaint not only made him a witness as to the factual averments, but his having Defendant Claire Risoldi substitute her verification for his essentially threw her "under the bus" as the averments were adverse to and admissible against her in the criminal case.

Attorney Donato countered that the averments were true and accurately stated Claire Risoldi's position notwithstanding the AG's position that the statements were false.

25

### 3 – McMahon as a Defendant

The AG asserted that Attorney McMahon crossed the line from mere conduit of his client's position into an accomplice as there was evidence that should have prompted him to question his client's position. Accordingly, he could be charged criminally which the AG was considering.

Attorney Donato countered that Defendant Claire Risoldi was unwavering in her position that her statements regarding her insurance claims were true and that it was up to the jury to decide which position was correct. Until then, Attorney McMahon was free to espouse that position despite the evidence the AG relied upon. Accordingly, he had done nothing for which he could be charged.

### Discussion: Items 1 – 3

While I initially expressed concern with Attorney McMahon being called as a witness, I felt that ground could best be addressed once I saw what the AG wanted to ask, especially given the defense's willingness to stipulate and my belief that the AG likely had other means of establishing the same information. I also had to consider the

26

AG's right to present its case as it wanted and to call the witnesses it wanted if it did not contravene the fundamental right of defendant to counsel of her choice.

The argument that Attorney McMahon had thrown his client "under the bus" by having her sign the verification was also troubling, as was the accomplice argument. I expressed my reservations at N.T. May 18, 2015, pg. 40, l. 8 – pg. 42, l. 2. The AG appears to want me to be bound by my statements then and finds my subsequent reversal of position to be "inexplicable". I disagree. The purpose of these discussions was to explore the parties' positions to aid me in resolving the issues. Such questioning was necessary and proper to fully inform me before reaching a final resolution of the issues.

If a jury finds the claims to be fraudulent, the AG's version of the case is vindicated and one or more defendants will be guilty. If the AG's version does not prevail, the defendants and one or more of them will be not guilty, but they will still have to prove their claim(s) in civil court proceedings. In either event, there is no conflict between Attorney McMahon and his client as the representations at issue are hers, not

27

his.

The simple answer to #3 is that Attorney McMahon has not been charged criminally.

Accordingly, Defendant Claire Risoldi's constitutional right to counsel of her choice outweighed the AG's reasons to deny same.

### 4 - "Snitches get Stitches"

On August 14, 2014, Defendant Claire Risoldi verbally accosted Mr. O'Keefe calling him "rat bastard," etc. At some point in her tirade, Defendant Claire Risoldi referenced prison and asked Attorney McMahon to say what happens to snitches in prison. He said, "snitches get stitches, that's what they say." The AG took this comment as an attempt by Attorney McMahon to intimidate Mr. O'Keefe and as a violation of the Rules of Professional Conduct.

Attorney McMahon said he was just trying to defuse the situation.

### 5 – Rules of Professional Conduct

The AG has not specified the rule they rely upon. I infer they are referring to

28

Rule 8.4 – Misconduct.

## Discussion: 4 – 5

I did not, and do not believe for one moment, that when Attorney McMahon uttered his "stitches" comment that he did so with the intent to intimidate Mr. O'Keefe. I did not see the comment as "troubling," even coming from an officer of the court. Rather, I saw it as a foolish effort to placate his client in order to defuse an out-of-hand situation. Not every unwise comment is, or should be, actionable either criminally or under our professional rules. No objective person would view the comment in context as a violation of the Rules of Professional Responsibility or as a criminal act.

Neither of these issues warranted Mr. McMahon's removal as Defendant Claire Risoldi's counsel of choice.

### C. Ex Parte Communications

The AG asserts that my failure to advise counsel of a telephone call from Defendant Claire Risoldi and my two calls to her counsel regarding her conduct constitute **ex parte** communications that I should have reported. The AG further asserts

29

that my comment that their suggestion that I do so was "impertinent" is further evidence of my bias against them and in favor of Defendant Claire Risoldi.

The first alleged "**ex parte** communication" occurred at the conclusion of a court hearing when a distraught (my characterization), Claire Risoldi began to berate AG Connolly. I acknowledge a violation of the Code of Civility, Article I, (2), when I essentially told her "to shut up, that she wasn't helping herself and to leave". I contacted Attorney McMahon shortly thereafter and told him "never to walk out of court again without his client in tow". No objective person, lawyer or lay, would say this was an **ex parte** communication given Mr. Connolly's presence and the fact that nothing bearing on the substance of the case was said to Defendant or Attorney McMahon. AG Augenbraun admitted as much (N.T. 4/29/16, pg. 113, l. 1-2).

The second incident is when Defendant Claire Risoldi called sometime after my Habeas Corpus Opinions were filed in September, 2015. I repeat the substance of that conversation:

> As I am my own secretary, I **answered my phone to a distraught Claire Risoldi** who told me she was without an

30

> attorney and had no money to hire one. I believe we are all familiar with the speed at which she can speak and it took me a second to digest what she was saying. When I did, I immediately told her to stop speaking, to never call me again for any reason and that if she could not afford counsel to contact the Public Defender's office. She hung up and I contacted Mr. McMahon who indicated that he did represent her and would speak to her.

Recusal Motion #1, pg. 2. (emphasis added).

The AG suggests that my comment that I regarded the suggestion that the contact should have been reported to all counsel was impertinent and evidences my bias. I did and do regard the suggestion as impertinent, especially given the first incident involving Defendant Claire Risoldi and my immediate response to it. This contact, like the first one, did not convey any substantive information about the case despite the AG's assertion that it would be admissible on the issue of Defendant Claire Risoldi's claim to have trust funds worth millions of dollars.

No objective person, lawyer or lay, would regard Defendant Claire Risoldi's distraught comment that she had no money to hire a lawyer as conveying substantive information about the case. Nothing in her comment was of benefit to her or a detriment to the AG such that they should have been given the opportunity to be heard given that I

31

immediately cut her off and referred her to the public defender's office. As such, there was no requirement that I advise counsel of the contact and no violation of Rule 2.9 of the Code of Judicial Conduct. Their suggestion that I confirm a contact I was not required to report was impertinent.

## D. Resolution of Habeas Motions

The AG asserts:

> This Court's demeanor during the habeas proceedings created an appearance that the Court had pre-judged the case, had a certain disdain for the grand jury process, had hostility towards the Commonwealth, and a bias in favor of the defendants.

Recusal Motion #2, pg. 21.

Oral argument on Defendant's Writs of Habeas Corpus was held on July 17, 2015. Significantly, the court was not provided with the preliminary hearing transcripts prior to the argument. In fact, the preliminary hearing transcripts were not filed of record until April 15, 2016 and then only after I inquired as to why they still had not been filed. Accordingly, **the court's sole source of information upon which to entertain argument was the briefs of the parties.** The AG's office makes much of the fact that I

32

had not read the preliminary hearing transcript prior to oral argument. Frankly, I did not have the time to do so even if it were available to me given the myriad of other matters I was dealing with and the fact that it is over 2,000 pages in length. I did not wish to delay argument given that I had set a November trial date and knew that I could read the transcripts at my leisure while on vacation before deciding the motions. A review of the argument transcript will reveal that there was sharp questioning by me and that the parties were challenged as to their reasoning and positions, especially the AG. To me, such questioning is what oral argument is intended to be. The AG suggests my questioning favored the defense to the detriment of the AG. I disagree. I asked questions as to issues that concerned me, especially on the issue of corrupt organizations and the AG's theory that certain defendants were liable as conspirators due to statements they made after the 2013 fire. Again, this should have come as no surprise to the AG given what I had said during the bypass hearing on March 2, 2015, "and then there are other parts (of the Presentment) that are somewhat nebulous. And in my mind that would be the corrupt organization as to when ..." (N.T., 3/2/2015, pg.

33

55, II. 13-16).

At the conclusion of oral argument on the writs, I did exactly what I believe both counsel and an informed public would expect a judge to do when I stated:

> **THE COURT:** Okay. I think I've heard enough. We're still on for our November trial date – wait a minute. We're still on for the November trial date.
>
> I will tell you in all candor, counsel, I have serious problems with your corrupt organization theory. And I have serious problems as to Carla, Sheila, and Mr. Goldman.
>
> **But we're going to sit down and take the time to go over everything that everybody's given to me, take a look at things again.** I'm interested in any help anybody can give me on the theory that the voidability of the contracts under the civil law can get incorporated somehow under the criminal side and that a lie or two lies, assuming that they're lies, puts us in a corrupt organization, the purpose of which was fraud. How the statements of some of the people – I'm just telling you, I have a big problem there.
>
> You're not going to get anything written for a couple weeks, because hopefully I will get my vacation. I have other matters to attend to first. But you will have everything in time to be able to proceed to trial.
>
> **Again, speaking off the top of my head, the witness intimidation I don't see any intimidation of Mr. O'Keefe.** Mr. O'Keefe is in the business. He's had angry policy holders get in his face. I don't see that.
>
> Ms. Mazaheri, I think on the record, there's enough suggestion to her and then I think her subsequent testimony is trying to make a bad situation less difficult. I think there is enough for her.
>
> Those counts that related to the – Mrs. Risoldi on the murals and ALE, that's definitely in.

34

(N.T. 7/17/15, pg. 194, l. 13, pg.195, l. 25).

The AG further argues:

> This Court's ultimate resolution of the habeas petitions demonstrates that the Court had not reviewed the record from the preliminary hearing prior to repeatedly challenging prosecutors as to evidence established at the hearing adopted facts not of record but advanced in defense filings, failed to view the evidence in the light most favorable to the Commonwealth as required, failed to give effect to reasonable inferences drawn from the evidence as required, considered evidence not of record as well as made improper credibility determinations, and exhibited a misunderstanding of or refusal to acknowledge the elements of the offenses charged.

Recusal Motion #2, pg. 22.

The easy answer to these assertions is that the AG did not appeal any of my Habeas

Corpus rulings[11] which suggests **they knew** I followed the appropriate standard of

review.

The AG raises numerous issues pertaining to my rulings regarding Defendant

Mark Goldman. My two Opinions ruling on his Habeas Motions clearly set forth the legal

basis for those rulings and require no further comment. I incorporate those opinions

herein by reference thereto.

---

[11] I ruled that the pre 2013 conduct was inadmissible as to defendant Claire Risoldi on the corrupt organization count. I found that the O'Keefe

35

The AG goes on to assert regarding my Goldman rulings that:

> **This Court's bias in favor of Goldman was highlighted by this Court's expressed concern over the status of Goldman's private detective license.** Following the Court's dismissal of all charges related to Goldman, this Court asked SDAG Augenbraun about the status of the Commonwealth's appeal of that decision because the license renewal was being delayed by the open charges. It is unclear how this Court became aware that Goldman's license required renewal and/or any effect the charges would have on the renewal. Certainly an inference is raised that the Court had *ex parte* communication with either Goldman or Goldman's attorney. Regardless of whether or not any such communication actually occurred, the appearance of impropriety exists.

Motion to Recuse #2, pg. 26.(emphasis added.)

At the time this comment was written, the AG did not have available my reason for asking about Goldman's license. Of course, the AG could have asked why I was inquiring when I did so which would have revealed the perfectly proper nature of the request. At the hearing of April 29, 2016, I said:

> So, then, we're going to have one additional Court Exhibit, because you've raised the issue about Mr. Goldman's private detective license and how did I know what was going on. And I had my staff at Chester County go take a look to figure out what was going on, because I had no idea how I got it.
>
> And on July 24th of 2015 an application was filed in the Clerk of Courts Office in Chester County, and I have a computer printout of those records that is going to be part of

intimidation count was made out. I dismissed the Writs of the other Risoldi defendants. I granted the Writ of Goldman.

the record.

And on October 20th there is a report from a Kevin Dykes, (sic) who was in the Chester County District Attorney's Office, who does the background examinations. He sent a report to the Clerk of Courts and copied in various people, all of whom are law enforcement personnel either in the District Attorney's Office or the District Attorney's Detectives Office, indicating that there were issues that would preclude Mr. Goldman from getting his license. And attached to it is, of course, a copy of docket entries here in Bucks County indicating that I had entered an Order in the Goldman case.

The matters for private detective licenses go on the miscellaneous list in Chester County and go to whichever Judge is miscellaneous Judge, unless somebody figures out one Judge knows more about it than the other. I'm going to assume that it came up to me because my name was on it from Bucks County.

I think when I inquired of you, Mr. Augenbraun – and you can state your own position – **I was asking in the context of whether or not you were going to do anything with the appeal from habeas number one, because obviously, if you were, that would have an impact on Mr. Goldman's ability to be re-licensed.**

(N.T. 4/29/16, pg. 140, l. 6, pg. 141, l. 25)(emphasis added).

My inquiry was made for the sole purpose of deciding whether Mr. Goldman's application was ripe for a hearing or not. The AG's decision on whether to appeal my habeas ruling was a relevant consideration. Once Defendant Goldman was rearrested, no action was taken on the license renewal. I fail to see how my taking no action on his license renewal evidences bias in his favor and/or against the AG. I believe any

37

objective person, attorney or lay, would recognize the propriety of my asking as to the status of an appeal.

The AG suggests that my asking about the status of the Goldman appeal calls into play the issue of an *ex parte* contact with Defendant Goldman or his attorney. Again, an *ex parte* communication is one bearing on the substance of a matter in which the adverse party has an interest. The AG seems to infer that any contact with an attorney involved in these cases in any other case need be reported to the AG. To state the proposition, is to recognize the burdensome impracticality of it. Renewal of Goldman's license was not relevant to prove or disprove any issue in these cases. As such, there was no need to inform the AG as to how the matter came to my attention. Accordingly, there was no violation of Rule 2.9 of the Code of Judicial Conduct.

As to the AG's claims of hostility in the Holston matter, to wit my:

1. Discussion of manner of questioning by AG personnel during Holston's Grand Jury appearance, and

2. Resolution of perjury charge,

38

I rely on my Opinion which I incorporate herein by reference thereto which fully explain

my reasoning.

The AG also notes my comments to Agent Gomez:

> Lastly, on June 18, 2015, Special Agent Luis Gomez dropped off documents for the Court. At that time, this Court pointed to defense filings and commented that they were less than Commonwealth filings and inquired as to whether the Commonwealth expected the Court to read all of the material. Based on the Court's decisions and often incorrect statements as to the Commonwealth's position on a variety of issues, the Court's comment to Special Agent Gomez is particularly troubling and indicative of the appearance of impropriety that has been created.

Motion to Recuse #2, pg. 27.

This statement needs to be reviewed in context. I attach as Exhibit 1 an e-mail chain that included the AG. It expressed my "tongue-in-cheek" comment, "I may have to shop for a dolly to transport all the paper am I certain I will receive from your colleagues and the AG." Two days later, Agent Gomez arrived with two bankers boxes of documents that clearly dwarfed Mr. Engle's "tome." While I have no recollection of even speaking to Agent Gomez, common sense tells me I would not have made such a comment as the boxes contained exhibits that were meaningless in and of themselves without the transcripts where they were discussed. However, as is clear from my Habeas Corpus

39

Opinions and preliminary hearing notes, Court Exhibit 2, I did in fact read the AG's

paperwork **before deciding the motions.**

### E.    Severance Motions

The AG asserts:

> The effect of the *sua sponte* severance was to suppress a significant amount of Commonwealth evidence. The Court's resolution also demonstrated a continued misunderstanding of the case and/or an effort to prevent the Commonwealth from presenting relevant evidence. The fact that the Court has repeatedly expressed the erroneous view of the case as events occurring prior to the 2013 fire and events occurring after rather than the clear course of conduct established by the evidence demonstrates the Court's apparent inability to consider the case fairly and impartially. It certainly calls into question the Court's ability to rule impartially on the admissibility of evidence at trial. The fact that the Court *sua sponte* fashioned a severance that significantly damaged the prosecution as to all defendants and provided a potentially viable appellate issue for the lead defendant provides substantial evidence that this Court has lost objectivity.

Motion to Recuse #2, pg. 28.

It is a trial judge's task to see to it that all parties receive a fair trial. It was clear

to me that a joint trial would result in the jury hearing evidence against Defendant Claire

Risoldi that was inadmissible against the other defendants. My Habeas Opinion of

September 15, 2015, accepted the AG's "course of conduct" theory as to Defendant

Claire Risoldi, but essentially rejected it as to the other defendants. I was aware that

40

the AG wished to present a "seamless timeline" case against Defendant Claire Risoldi covering the period 1984 through 2013 and beyond. However, the "course of conduct" theory was not applicable to the other defendants, except as to Defendant Carl Risoldi on the count charging "Dealing in Proceeds of Unlawful Activities".

The AG asserts that my *sua sponte* decision to sever by date "suppresses a significant amount of Commonwealth evidence". Not true. The AG would have been free to present all its 1984 through 2013 and beyond evidence against Defendant Claire Risoldi. The problem with this severance is that it put all other defendants at risk of evidence that was inadmissible against them being heard by the jury. The sole exception being Defendant Carl Risoldi on the unlawful activities count. I recognized that I had to balance the potential prejudice to the other defendants against the convenience of a single trial. Severance by date, I came to realize created more problems than I was trying to resolve as became evident by the numerous motions *in limine* filed by the defendants. As I rethought my ruling, I kept in mind the importance to the AG of being able to present a seamless timeline case (1984-2013) against

41

Defendant Claire Risoldi. The obvious solution was severance by defendant which allowed the AG to present its seamless timeline case against Defendant Claire Risoldi and eliminated the prejudice to the other defendants of her pre-2013 course of conduct which was inadmissible as to them. Importantly, the AG agreed to this severance which, in my mind, makes the issue of my supposed bias on this ground moot. The defendants have no appealable issue as they **agreed** to the severance. Severance by defendants also eliminated the potential appellate issues a joint trial would have created.

Another example the AG's presented as to my supposed bias is their suggestion that my referring to Ashley Rodrigues as "that cleaning woman" evidences my, "failure to adequately review the preliminary hearing transcript and/or to fairly evaluate the evidence to render objective rulings."[12]

On January 15, 2016, in order to accommodate all counsel, I heard oral argument on the severance motion in Chester County. As part of the general

---

[12] Motion to Recuse #2, pg. 28.

42

discussion as to why the AG did not want <u>any</u> severance, the issue of "drapes" came up. The AG's position all along has been that the drapes in the 2013 fire were the same drapes that were in the house at the time of the August 16, 2010, fire, i.e., they were never replaced after the 2010 fire even though the insurer had paid to have them replaced. I commented:

> THE COURT: And your position is the drapes were never replaced?
>
> MR. CONNOLLY: Correct.
>
> THE COURT: Okay. And the lady who is going to say – that cleaning lady for the 2013 fire said it looked like the same drapes that were here in 2010.
>
> MR. CONNOLLY: Yes.

(N.T. 1/15/2016, pg. 25, ll. 12-19).

Frankly, I thought I did quite well in recalling that the same person was involved in both the 2010 and 2013 fires regarding the drapes. Court exhibit #2 lists the **twenty different persons** whose testimony I reviewed in August of 2015. How my failure to recall Ms. Rodriguez's name and exact duties four months after I reviewed the notes of testimony translates into, "an ongoing effort to minimize evidence to the detriment of the

43

Commonwealth and benefit of the defense"[13] escapes me. I believe it would also escape any objective person, lawyer or lay.

At the recusal hearing the AG submitted numerous news articles, see Exhibit CW-13, to support its assertion that:

> This case has generated a tremendous amount of media attention which will likely only increase at trial. Indeed, many of the public comments to news articles related to this case have expressed a belief that the defendants will receive special treatment due to their wealth, status in the community and substantial political contributions. Accordingly, the need to avoid the appearance of impropriety is heightened by the intense public scrutiny.

Recusal Motion #2, pg. 30.

A review of the news accounts reveals that the reporter for *The Intelligencer* newspaper, Ms. Ciavaglia, has been very factual with her reporting. They also reveal that certain "bloggers" believe that the Risoldis have received preferential treatment. The factual newspaper reporting does not imply any impropriety or bias in my rulings. In fact, the only suggestion of same comes from the reporter's factually reporting the AG's motions regarding the issue. My Opinions are not written to find favor with anyone; they are written to demonstrate my compliance with the controlling legal principles applied to

---

[13] Motion to Recuse #2, pg. 29.

44

the credible facts.

## Recusal Motion - #3

At the conclusion of the hearing of April 29, 2015, on Recusal Motions #1 and #2, the parties were given the opportunity to submit briefs. The AG's response was this motion.

The AG asserts:

> It is the Commonwealth's position that the Court's recusal hearing exhibits both raise more questions than answers to the Commonwealth's concerns as well as add to the appearance of impropriety.

Recusal Motion #3, pg. 3.

At the hearing I had three exhibits marked:

1. Court Exhibit #1 was a flow chart that I prepared in anticipation of oral argument on defendant's Writs of Habeas Corpus, and

2. Court Exhibit #2 were my handwritten notes made while on vacation in August of 2015 when I reviewed for the first time the seven days of preliminary hearing testimony, and

3. Chester County records pertaining to Mark Goldman's private detective

45

license.

I also provided Notes of Testimony from the July 17, 2015 hearing that had previously been sealed. Due to the averments of the AG in Motion to Recuse #2, the notes were relevant and needed to be made part of the record.

## A. McMahon Disqualification

The unsealed Notes of Testimony prompted this comment by the AG:

> The fact that this Court immediately disclosed the status of a Grand Jury investigation, the Commonwealth's theory of the potential criminal action and a summary of evidence provided to the Court *in confidence* by the Commonwealth to Attorney McMahon, a *target of the investigation*, and Attorney Engle is troubling to say the least. The fact that this Court did not advise the Commonwealth at the relevant time that it had done so is even more troubling. Even worse, this Court did not provide the Commonwealth with an opportunity to respond to the representations made by Attorneys McMahon and Engle prior to ruling adversely to the Commonwealth. This new revelation alone provides a basis for recusal as the appearance of impropriety is glaring.

Motion to Recuse #3, pg. 5.

As I have already addressed their other arguments as to Attorney McMahon, I will only address these new grounds.

The AG has, again, taken my actions out of context to create an appearance of

46

bias and/or impropriety where neither exists. On July 17, 2015, one of the issues to be addressed was who would argue Defendant Claire Risoldi's Habeas Corpus Motion as I had not yet ruled on the AG's Motion to Disqualify Attorney McMahon. **Before** we went off the record and I had the en camera conversation with counsel, the following occurred **in open court**:

> THE COURT: Ma'am (I was addressing Defendant Claire Risoldi), the Government's contention is that Mr. McMahon, in part, had to do that (substitute her verification of the Complaint for his), because it would relieve him of any complicity in the case. Their theory possibly being – no one is saying that it is – possibly being that, by submitting that document on your behalf, **he was somehow involved in an attempt to obtain from the insurance company monies that ought not to be obtained.**
>
> Do you understand that that's their theory?

(N.T. 7/17/15, pg. 24 l. 6-pg. 25, l. 1)(emphasis added).

> And

> THE COURT: We had the conversation[14] in the conference room, off the record, as to other options that the Commonwealth had, which you indicated at that point in time you were not going to pursue. Namely, that you did believe there was sufficient evidence to somehow charge Mr. McMahon. My understanding is that is off the table.

(N.T. 7/17/15, pg. 27, ll. 18-25).

My comment brought this response from Attorney Augenbraun:

47

**MR. AUGENBRAUN:** With respect to the issue of potential charges, my recollection of the discussion and also **argument in open court was that that was still an open issue, and that investigation is ongoing. There is a grand jury that's going to be starting in the Eastern Region, I believe, in the first week of August. And our intention is to take action there.**

I don't want to say more about that, because of grand jury secrecy. I'm not sure why Your Honor is now saying that's off the table. I want you to know from the Commonwealth's standpoint that it's not off the table. My recollection is that Your Honor had substantial concerns over the potential issue –

**THE COURT:** Of course.

**MR. AUGENBRAUN:** – when we discussed it both in chambers and also on the record, that that was a significant issue for Your Honor. But I don't want you to be misled to think that that is a done issue. It is not, and it still possibly exists out there.

Is our intention to pursue that aspect of the investigation, as was discussed on the record with the previous grand jury, judge.

(N.T., 7/17/15, pg.29, l. 2 – pg. 30, l. 1)(emphasis added).

Attorney McMahon's response to the AG's statement was:

**MR. McMAHON:** Judge, the Government is proposing to you nothing more than speculation. There's nothing of any substance that they have presented to you at this juncture. I'm willing for them to present it to you.

I mean, merely standing before somebody and saying, we're going to investigate something doesn't make anything true, doesn't make it real, doesn't make it anything. They can investigate you, me, the man in the moon, but it

---

[14] This conversation occurred during the hearing held on May 18, 2015.

doesn't make it real and it doesn't make it viable.

I can only say I'm investigating your clerk. That doesn't mean there's anything there. That doesn't mean it's going to be there. That doesn't mean there's any basis today for any conflict. There's no basis on this record today for a conflict. Now, if that record changes, obviously, that record changes, but it doesn't change today.

And merely – under that theory, Judge, any lawyer could be excluded by them just by coming in and saying, we're looking into him in the future. Okay? Therefore, he's excluded. We're looking into him in the future. No lawyer could ever sustain that with that allegation by the Commonwealth.

Put it on the record and put on the facts that would create the conflict, fine, but just to say that we're looking at something is nothing but guesswork, speculation, and could be done to any human being anywhere. So there's no basis for any conflict, as we sit here today. And that's what we're dealing with. To rule on some innuendo or something that may happen down the line, how can you rule on that?

(N.T. 7/17/15, pg. 33, l. 2 – pg. 34, l. 12).

Mr. Augenbraun's response was:

Your Honor, the only thing I would say further in terms of what we're doing, it's not speculative, and it's not something we're doing in the future. We're currently engaged now. That's the only thing I can say. **I mean, if Mr. McMahon wants more detail, I suggest we do it –** it shouldn't been be done in open court.

THE COURT: Okay. We can do it.

(N.T. 7/17/15, 34, ll. 15-23)(emphasis added).

I then met jointly and separately with counsel in an adjoining jury room.

## JOINT MEETING

49

Present for this meeting were Attorneys Augenbraun and Connolly for the AG,

Defendant Claire Risoldi and Attorneys McMahon and Engle. I stated:

> **THE COURT**: As I would understand it, the Commonwealth is going to suggest that as a result of that representation that there is some conduct on the part of Mr. McMahon that The Government would suggest to a grand jury is inappropriate conduct that should be looked into and that possibly action should be taken against Mr. McMahon.
>
> Is that a fair statement?
>
> **MR. AUGENBRAUN**: That's a fair statement

(N.T. Sealed Transcript 7/17/15, pg. 2, ll. 9-19).

> And

> **THE COURT**: So what I'm saying to you [Mr. Augenbraun] is: The strength of the case that would be presented to the grand jury would be the controlling factor in my mind. Because if you've got a good case, but you just want to get it presented before November, then he can't stay in the case, whether it gets presented after November or not.

(N.T. Sealed Transcript 7/17/15, pg. 4, ll. 18-25).

I then had Defendant Claire Risoldi and Attorneys McMahon and Engle step out.

Attorney Augenbraun then represented that the AG believed that Attorney McMahon was on notice that the AG had a strong case and Attorney McMahon's continuing to press the defendant's claims indicated he had crossed the line from unwitting attorney in presenting a fraudulent claim into an accomplice knowingly

50

presenting one. The following exchange then occurred:

>THE COURT: The problem that I have with your entire theory here is that your position would be that you've put facts out which you believe show insurance fraud. The client says, I haven't committed insurance fraud, and I want to file a complaint, because the only way I can get any relief from the insurance company is to sue the insurance company, because they won't pay me.
>
>So an attorney, who then goes ahead and files that complaint to argue that, that attorney is acting in furtherance of some illicit scheme to defraud the insurance company, would mean that any time an insurance company wanted to decline payment they could do so and do so on the theory the evidence is, as we read it, suggests fraud. And if you get a lawyer to represent you, our position is going to be the lawyer is acting in furtherance of the attempt to defraud us. It just doesn't work.
>
>MR. AUGENBRAUN: Well, except that for an insurance company to actually deny a claim for fraud they have to be able to prove fraud. They can't just say, we think it's fraud. You're right. If an insurance company had the ability to just say, we think it's fraud, yor [sic] claim is denied. That's the end of it.
>
>THE COURT: But they haven't proven that there's any fraud yet. Their theory is there is fraud. And somebody's going to have to decide whether the jewelry was there, it wasn't there, whether it worth money, it wasn't worth money or anything else.

(N.T. Sealed Transcript 7/17/15, pg.13, l. 16 – 14, l. 23).

This exchange prompted another:

>THE COURT: So let's go and cut to the chase. If we have all this, what precludes you from charging him? Without going through the grand jury, just charging him?
>
>MR. AUGENBRAUN: You're correct. Right now we

51

could. Your Honor, it's the -- as you know, I'm a senior deputy attorney general, not a chief, I'm not an executive. There are people above me who have to be satisfied. And right now their preference is to go through the grand jury.

I can have discussions with them. I will be glad to do that, because I will tell you right now that I don't disagree with you.

(N.T. Sealed Transcript 7/17/15, pg. 20, l. 20 – pg. 21, l. 8).

I had the AGs step out and then addressed Attorneys McMahon and Engle stating:

THE COURT: If Mr. Augenbraun had his way, you would be charged today, criminally, Mr. Augenbraun said that regrettably he has supervises [sic] to whom he must report, and they want the grand jury process to proceed.

His theory is that, and I think it is correct, in the habeas petition that you filed that you concede that Claire Risoldi has potential exposure with regard to the mural claim, that the pricing is inflated. And that, with regard to the alternative living expenses, she clearly has exposure because four thousand versus three thousand.

(N.T. Sealed Transcript 7/17/15, pg. 22, ll. 7-19).

**My statement revealed nothing that had not already been stated in open court.** I invite the reader's attention to pages 23 to 31 of the transcript. They show the discussion we had as to the AG's theory and why I came to accept that it did not require Mr. McMahon's recusal. See also the comments I made at pages 26 and 27 of this Opinion.

52

The AG avers that "[t]he fact that this Court did not advise the Commonwealth at the relevant time that it had done so is even more troubling." Motion to Recuse #3, pg. 5.

By "done so" I assume the AG is asserting that I had disclosed **their already publicly stated theory** to Attorneys McMahon and Engle and/or advised them of the AG's grand jury intentions. I believe the following comment makes clear that I <u>had</u> conveyed the AG's comments as to its intentions:

> **THE COURT**: We're going to resolve the matter this way: We are going to proceed with the arguments today. If the attorney general chooses to charge Mr. McMahon, you can charge him. You're going to have to charge him outside the investigating grand jury or you're free to proceed with the investigating grand jury.
>
> But, until such time as Mr. McMahon is charged, I think that Mrs. Risoldi's right to counsel trumps what has been presented to me thus far, in terms of disqualifying Mr. McMahon.
>
> So on the record, as it exists today, Mr. McMahon is not going to be disqualified. If he's charged, that becomes an entirely different situation. And we will permit him to argue the motions today.
>
> Obviously if he's charged, then we have to revisit all of that. But I think that's all I need to say.

(N.T. Sealed Transcript 7/17/15, pg. 33, ll. 3 – 21).

As to the AG's argument that I did not give it an opportunity to respond to the

53

argument of Attorneys McMahon and Engle, my response is that it did not ask to do so.

In fact, its sole request was:

> MR. AUGENBRAUN: Judge, the only thing I would request, I hate to hit you with another colloquy, but I think it would probably be best to colloquy Mrs. Risoldi on the record, **concerning the typical issues you get here where counsel is a potential target** that, again, the issue of recurring favor with the Commonwealth, make sure she understands that.

(N.T. Sealed Transcript 7/17/15, pg. 33, l. 22 – pg. 34, l. 4 (emphasis added).

Anyone who takes the time to read the transcripts of the court proceedings in this case to date, 7 in number, will see that I never cut counsel short or declined to entertain their argument. Had the AG asked to be heard, they would have been.

As to the remaining averments of Section A, I have already addressed Attorney McMahon as a necessary witness, see discussion at pgs. 26 and 27. I also addressed this alleged conflict of interest, see discussion at pgs. 26 and 27. I saw no need to discuss attorney/client privilege or the crime – fraud exception. Not every issue raised merits discussion.

### B. Resolution of Habeas Petitions

54

In addition to the previously addressed issues raised by the AG, see discussion at pp. 30-33, the AG asserts:

> This Court, however, submitted Court Exhibit 2 consisting of notes taken by the Court while subsequently reading the transcript. *Id.* At 105. The Court's notes appear to confirm the Commonwealth's assertion that this Court ignored the well-established standards for evaluation whether or not a *prima facie* case was established. Specifically, the notes appear to reflect that this Court did not view the evidence in the light most favorable to the Commonwealth and failed to give effect to reasonable inferences drawn from the evidence as required. (See Court Exhibit 2). In addition, the notes reflect this Court's consideration of matters not properly before the Court including the sufficiency of evidence for trial, restitution issues and potential defenses. (See Court Exhibits 1, 2).

Recusal Motion #3, pg.6.

The AG does not support a single averment by reference to any comment contained in Court Exhibit #2. At the risk of repeating myself, the easy answer is that the AG did not appeal any of my habeas rulings set forth in my Opinion of September 15, 2015. Had I failed to view the evidence in the "light most favorable" to the Commonwealth, I certainly would not have ruled in its favor.

The AG further asserts regarding Court Exhibits 1 and 2,

> In addition, the notes reflect this Court's consideration of matters not properly before the Court including the sufficiency of evidence for trial, restitution issues and

potential defenses. (See Court Exhibits 1, 2)"

Motion to Recuse #3, pg. 6.

While Court Exhibit #1 was prepared in anticipation of the Habeas Corpus arguments, it is inconceivable to me that the AG would not expect me to be formulating an overview of the case, its strengths, weaknesses, etc. My notes reflect my attempt to be forward looking, as opposed to responding to what was then before me. Doing so evidences proper case management practices.

## MARK GOLDMAN

This issue was fully addressed in my response to Motion to Recuse #2 and requires no further comment.

### III Defendant's Response to Recusal Motion

Interestingly, the AG asserts that,

> The defense response fails to cite to the record and included several factually erroneous and/or misleading statements.

Motion to Recuse #3, pg. 8.

I see no need for further comment.

### IV Conclusion

56

The AG asserts:

> T]he matter warrants a jurist that is able to preside and serve as fact-finder impartially, so that a fair verdict is rendered. . . However, it has become painfully evident that the Court has lost objectivity and that the appearance of impropriety is clear.

Motion to Recuse #3, pg.14.

I state unequivocally that I have no bias for or against any party in these matters. As to the "appearance of impropriety" argument, my response is:

1. Each and every decision I have rendered was made **after** a careful and impartial consideration of counsel's arguments, their pleadings, all the relevant evidence, applicable rules, statutes, and controlling case law. The decisions made were the result of an objective analysis of the evidence and the application of the applicable law to that evidence; and

2. Adverse rulings are not evidence of bias; they are part and parcel of every case.

There is nothing in my handling of these matters that would cause an informed member of the public to conclude that I was biased for or against any

57

party and/or that my resolution of matters evidence a "loss of objectivity" or create an "appearance of impropriety".

The AG's averments when looked at individually do not warrant recusal. Our Supreme Court has addressed the issue of cumulative errors, stating, "no number of *failed* claims may collectively attain merit if they could not do so individually" <u>Commonwealth v. Williams</u>, 615 A.2d 716, 722 (Pa. 1992) (emphasis in original).

Accordingly, I decline to recuse myself. Based on the foregoing, I enter my Order.

BY THE COURT:

Thomas G. Gavin          S.J.

58

# IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA

Commonwealth vs. Sheila Marie Risoldi : CP-09-CR-0002475-2015

Commonwealth vs. Carla V. Risoldi : CP-09-CR-0002485-2015

Commonwealth vs. Carl Anthony Risoldi : CP-09-CR-0002474-2015

Commonwealth vs. Claire A. Risoldi : CP-09-CR-0002487-2015

Kelly M. Sekula, Esquire, Senior Deputy Attorney General
Emily Cherniack, Esquire and Jack McMahon, Esquire, for Defendant Claire A. Risoldi
Michael J. Engle, Esquire, for Defendant Carl A. Risoldi
Mary Therese Maran, Esquire, for Defendant Sheila M. Risoldi
Brian McMonagle, Esquire, for Defendant Carla V. Risoldi

## 1925(b) OPINION

The Attorney General, hereinafter AG, has timely filed its 1925(b) statement. At sixteen pages, it is hardly concise. Rather, it is in large measure a generalized restatement of its position which my Recusal Opinion addressed. The AG also presents issues not previously raised which I will address.

### 1 – *Ex Parte* Communication

The AG asserts that defendant Claire Risoldi's call to my office shortly after my Habeas Corpus Opinion of September 15, 2015 was filed calls into play Pa. Rule of Evidence, Rule 605. This is the **first time** the AG has cited the rule as a reason why I should have recused myself.

The clear intent of Rule 605 is to avoid a judge testifying in a case where he/she is presiding as it is destructive of the goal of an impartial judiciary. See Municipal Publications, Inc. v. Court of Common Pleas, 489 A.2d 1286, 1289 (Pa. 1985). Implicit in the rule is that the judge's testimony is "required." The AG attempts to get around this underpinning by asserting

1

that it "should not be precluded from presenting its case in the manner of its choosing." (Statement of Errors at 4). No litigant is free of judicial oversight in the presentation of their case. Court imposed limitations are a fact of life. Here, the AG had alternative means of making its point regarding defendant Claire Risoldi's wealth short of calling me as a witness. Given these other options, the rule does not require my recusal.

The AG asserts that a defense stipulation as to, "the substance of the conversation" would include "substantive statements by the Court", thereby implicating Rule 605. (Statement of Errors at 4). This is the first time that the AG has asserted my comments to her were "substantive." My telling her to "never call me again" and/or to "contact the Public Defender" are NOT substantive statements as that term is understood.

The AG asserts that I mischaracterized its position, "regarding the *ex parte* communication with Attorney McMahon following a post hearing outburst by Claire Risoldi." (Statement of Errors at 5). The AG now asserts its position is that, "the *ex parte* communication occurred during the phone call to Attorney McMahon outside the presence of any attorney for the Commonwealth." (Statement of Errors at 5).

In Recusal Motion #1 the AG plead:

3.      On September 21, 2015, Attorney McMahon advised SDAG Augenbraun that Claire Risoldi had made a phone call to this Court during the week of September 12, 2015.

4.      On October 6, 2015, SDAG Augenbraun sent this Court a letter requesting that the incident be memorialized. This Court responded in an email and summarized the incident as follows:

> As I am my own secretary, I answered my phone to a distraught Claire Risoldi who told me she was without an attorney and had no money to hire one. I believe we are all familiar with the speed at which she can speak and it took me a second to digest what she was saying. When I did, I immediately

2

told her to stop speaking, to never call me again for any reason and that if she could not afford counsel to contact the Public Defender's Office. She hung up and I contacted Mr. McMahon who indicated that he did represent her and would speak to her.

5. The substance of the conversation has made the Court a potential fact witness.

Recusal Motion #1, p. 1-2, paragraphs 3, 4, and 5.

The AG did not raise any alleged *ex parte* communication between the court and Mr. McMahon in this motion.

In Recusal Motion #2, the AG plead:

This Court further revealed that it had contacted Attorney McMahon following a courtroom outburst by Claire Risoldi and suggested Attorney McMahon get control of his client. This Court noted that it had not disclosed that conversation with prosecutors or other defense counsel either. This Court further described as "impertinence" the suggestion that the matter be placed on the record.

Recusal Motion #2, p. 19.

I am uncertain as to exactly what the AG is raising. Apparently, my calling Attorney McMahon following the incident in Recusal Motion #1 was of no consequence, but my call regarding the courtroom outburst was. Asking counsel if he still represented defendant after her call to my office, and/or directing him to get her under control after her courtroom outburst, conveyed nothing of substance that need be reported to the AG or anyone else. Neither call to Attorney McMahon constitutes an "*ex parte* communication" as that term is understood. Carried to its logical conclusion, the AG would have me notify it every time I communicated with Attorney McMahon regardless of the subject matter of the contact. Such a procedure is unwarranted and the AG's suggestion that I should do so was impertinent.

3

## 2 – Witness Intimidation/bail

The AG asserts that the comment in my Opinion of August 1, 2016, that "civil case discovery was on-going" is further evidence of bias, impropriety and lack of familiarity with the facts of the case. (Statement of Errors at 6). This comment evidences the hyper technical reading given by the AG to every utterance I make or pen. The insurer, AIG was at Fox Chase Bank on August 14, 2014 relative to the Risoldi family jewelry loss. "Discovery" was an apt term to use to describe the activity that was occurring. The record supports my use of the term in that Attorney McMahon had sent AIG a letter on May 7, 2014, that he was representing the Risoldi family on their insurance claim. (N.T. 4/29/16, p. 22, l. 12-17). Further, I take judicial notice that the Risoldi's filed suit against AIG in the District Court for the Eastern District of Pennsylvania on October 17, 2014. See CA#94-7164 and CA#14-5898. It has been my experience that discovery occurs both pre and post filing suit.

The AG asserts that there was no basis for my conclusion that Mr. Foris did not view his interaction with Mr. Goldman and/or defendant Claire Risoldi as intimidating. (Opinion at 18). As to Mr. Goldman, I disagree. Mr. Foris testified that:

By Attorney McMahon

Q.  And just so I'm clear, the very first time you talked to any law enforcement: police, or anything like that, wasn't until October of this year, like last month, correct?
A.  That's what I would say, yeah.
Q.  Yeah. Then so after the time that Mr. Goldman left, you didn't call the police or anything like that, correct?.
A.  No.
Q.  You had no reason to call the police, correct?
A.  No.
Q.  Everything went fine with Mr. Goldman, correct?

THE COURT: Rephrase.

MR. McMAHON: I'll rephrase the question.

BY MR. McMAHON:

Q.    My point is, there was no — in your mind, when he left, there was no reason for you to call the police, correct?

A.    Right.

(N.T. 11/20/15, p. 41 ll. 2-p. 42 l. 1).

As the AG concedes, I held defendant Claire Risoldi for court on the charge of witness intimidation of Mr. Foris. I note regarding this issue that the AG has taken my comment out of context. My comment related to my discussion of Pa. R. Crim. P., Rule 520(A), not the evidence necessary to establish witness intimidation.

### Disqualification Motion

The AG asserts for the **first time** that my rulings and opinions explaining same evidence a disregard of legitimate commonwealth actions. My opinion stated the balancing test I went through in reaching my decision as to each item then under consideration. At no time have I failed to hear or address any point the AG wished to advance. The fact that I have ruled adversely to the AG in some of the matters they deem legitimate is not evidence of a disregard of their position. It is evidence that the facts and law did not, in my view, support their position. The timing of the AG's actions speaks for itself. The AG is free to characterize my noting the timing as they see fit. However, the AG fails to cite any objective evidence, other than adverse rulings, that I view its actions as attempted violations of the defendant's rights. Having failed to cite specifics, I am unable to respond further.

## 4. Habeas Matters

The AG asserts that my comments regarding Ms. Mazaheri and Mr. Foris (Opinion at 11-12-13)) evidence "a failure to view the evidence in the light most favorable to the Commonwealth." (Statement of Errors at 11). This bold assertion is made despite the fact that defendant Claire Risoldi was held for court on the intimidation charge involving Ms. Mazaheri and Mr. Foris. The AG reads my comments out of context to support their argument. My comments reflected my reasoning as to why I had not revoked and/or increased defendant Claire Risoldi's bail, not how I viewed the evidence as to the "witness intimidation" charges involving Ms. Mazaheri and Mr. Foris.

The AG cites my comment at page 35 of my Opinion that:

[T]he AG did not appeal <u>any</u> of my Habeas Corpus rulings
which suggests they knew I followed the appropriate standard of
review.

as evidence of "the appearance of bias and impropriety." (Statement of Errors at 12).

The AG has taken my statement out of context to support its argument. At pages 21 and 22 of Recusal Motion #2 under the heading "d. Resolution of habeas motions," it is clear that the motions being discussed were those of all defendants EXCEPT Holston. The AG's specific complaint was set forth at pages 34 and 35 of my Opinion:

This Court's ultimate resolution of the habeas petitions demonstrates
that the Court had not reviewed the record from the preliminary
hearing prior to repeatedly challenging prosecutors as to evidence
established at the hearing adopted facts not of record but advanced
in defense filings, failed to view the evidence in the light most
favorable to the Commonwealth as required, failed to give effect
to reasonable inferences drawn from the evidence as required,
considered evidence not of record as well as made improper

6

credibility determinations, and exhibited a misunderstanding
of or refusal to acknowledge the elements of the offenses
charged.

Recusal Motion #2 pg. 22.

which precedes the now challenged comment. When the AG's specific complaint in Recusal

Motion #2 is read together with Footnote 11 of my Opinion, there is no way a reasonable person

would view the comment as misleading. The fact is that they did not appeal my initial habeas

rulings.

### 5. Goldman

The AG points to my "*ex parte*" comments at page 38 of my Opinion as a "concession"

(on my part) that there was some *ex parte* contact. No reasonable person who reads pages 35-38

of my Opinion would come to a similar conclusion.

### 6. Severance

The AGs statement that it "ultimately agreed to severance by defendant because it was

less harmful to the Commonwealth's case than severance by date originally ordered by the

Court" (Statement of Errors at 13) is a bit disingenuous given this exchange:[1]

> THE COURT: How about we reverse-bifurcate, then, and we just try Claire
> first, try Claire only? You can try her from 1984 through 2013, and we'll try
> the other defendants at a later point in time. Does the Commonwealth want
> that option?
>
> MS. SEKULA: I think I would defer to Mr. Augenbraun about that. That would
> be severing by defendant, which your Honor denied initially. I don't believe there
> was any sort of reconsideration motion, so I would defer to Mr. Augenbraun as to
> whether or not that —

(N.T. 2/8/16, p. 5, l. 22 - p. 6, l. 11)

---

[1] See N.T. February 8, 2016, pgs. 5-12, for the full discussion, not the abbreviated one I set forth.

In answer to the question as to whether severance by defendant was acceptable to the AGs, Mr. Augenbraun responded:

> [T]he Commonwealth would agree that if your Honor wants to sever it by defendant as opposed to date wherein Claire Risoldi – as Mr. McMonagle suggested, Claire Risoldi will be tried separately, and he's saying first – and that's fine with the Commonwealth, it probably makes the most sense – and the other three are tried in a joint trial. It would certainly resolve a lot of these motions in limine concerns and things like that because they really – based on this other information that comes in against Claire by herself.
>
> **Clearly, legally, that severance is not something we can object to the way we are objecting to the severance by date, and it will eliminate those problems we've identified in our reconsideration, so the short answer is that we don't have a problem with that.**

(N.T. 2/8/16, p.11, l. 10 - p.12, l. 7)(emphasis added).

### 7. Defense response to recusal motion

The AG raises for the first time the argument that, the " defendants have not claimed that they would suffer any prejudice from the recusal." (Statement of Errors at 14).

The presence or absence of prejudice to the non-moving party has never been a factor in resolving a recusal request and the AG presents no reason why it should be. Thus, it was not addressed.

### 8. Miscellaneous

The AG asserts that my stating, "Frankly, I thought I did quite well in recalling that the same person was involved in both the 2010 and 2013 fires regarding the drapes" (Opinion at 43) demonstrates my "continued unfamiliarity with the record." (Statement of Errors at 14).

When I read the preliminary hearing testimony following oral argument on the original habeas motions, I was aware that the AG's position was that the drapes damaged in the 2013 fire were the same drapes that were in the house at the time of the 2010 fire. My notes of salient (to

me) points from the preliminary hearing transcript were marked as Court Exhibit #2. I noted that Ms. Rodrigues testified that the "drapes looked similar to the 2010 ones." Reading the evidence in the light most favorable to the AG, this evidence was sufficient to support its theory at the preliminary hearing stage, which was the proceeding I was then reviewing. I did not note her exact testimony, just as I did not note the exact testimony of the other witnesses whose testimony I reviewed. My notes are intended to be memory joggers only. The AG is correct that she was not present for the 2010 fire. However, this fact hardly evidences a lack of familiarity with the record. I believe that my opinions evidence a high degree of familiarity with the facts necessary to the issue then being addressed.

As no member of the public was called to state their perception of the "factual reporting" of the Risoldi matter, the record was and is devoid of any evidence to support the AG's claim that there is a public perception of bias in favor of the Risoldis.

The AG cites my comment, "My Opinions are not written to find favor with anyone; they are written to demonstrate my compliance with the controlling legal principles applied to the credible facts," (Opinion at 44) to support its belief that I improperly considered credibility issues in resolving the habeas corpus matters. This line is quoted out of context as it was contained in Section E of my Opinion, a section that was not addressing habeas issues.

### 9. Cumulative Effect

The AG faults my consideration of each issue individually. If there is another way of addressing issues, I am unaware of it.

The AG asserts that Commonwealth v. Johnson, 966 A.2d 523 (Pa. 2009) and Commonwealth v. Rhodes, 990 A.2d 732 (Pa.Super. 2009) support their position that the cumulative impact of multiple errors warrant relief where no single one would. Johnson was a

PCRA case wherein trial counsel's stewardship of the case was under review. There, trial counsel failed to articulate why certain actions were or were not taken, actions that bore directly upon the outcome of the trial. While no single failure was sufficient to warrant relief, the cumulative impact arguably was. Rhodes involved a recusal motion wherein the judge's conduct at sentencing was highly irregular. He had issued a press release in advance of the sentencing, had independently sought out evidence and had declined to review the pre-sentence investigation report. He failed to respond to the recusal allegations with the self-analysis every judge is required to engage in and openly castigated defense counsel for seeking his recusal.

Were you to find that my handling of this case was comparable to the failures of counsel and or the judge in the referenced cases, I agree that I should be recused and another judge assigned. However, I decided each matter presented by the parties in accordance with the controlling legal principles. If I made an erroneous decision, I did not do so out of bias toward the AG or for an improper motive. I do not believe a wrongly decided issue is grounds for recusal. Of course, I maintain that all my rulings were correct, including my decision not to recuse.

I respectfully submit that my decision be affirmed.

BY THE COURT:

_Thomas G Gavin_
Thomas G. Gavin          S.J.

10